UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: CASE NO. 17-11446

FACTORY SALES & ENGINEERING, INC SECTION "B".

DEBTOR CHAPTER 11

*****************************************************************************

FACTORY SALES &ENGINEERING, INC.

PLAINTIFF

VERSUS ADV. P. NO. 17-1049

ACE EUROPEAN GROUP, LTD, WESTCHESTER FIRE INSURANCE CO., AND CHUBB EUROPEAN GROUP LIMITED

DEFENDANTS

**MEMORANDUM OPINION**

This matter came before the court on January 16 and 17, 2018 as a trial on the complaint, removed from state court, of the debtor, Factory Sales & Engineering, Inc. ("FSE") against ACE European Group, Ltd., Westchester Fire Insurance Company, and Chubb European Group Ltd. (collectively, the "Sureties"). FSE seeks the return of funds it deposited with the Sureties as collateral security for bonds the Sureties issued pursuant to an Agreement of Indemnity between the two parties for construction projects FSE undertook for various clients. The crux of the argument between the parties is whether the collateral security was bond specific or whether the collateral security was cross-collateralized among several bonds. For the reasons set forth below, the court finds that the collateral security under this Agreement of Indemnity is not bond

specific, and the Sureties may retain the collateral security that they are holding and apply it towards any obligations on outstanding bonds issued on projects that FSE failed to complete for which the Sureties may be liable.

## I. Background Facts

On May 9, 2017 FSE filed a petition in state court seeking the return of $2.35 million in collateral held by the Sureties. Thereafter, the main bankruptcy case was commenced in this court on June 6, 2017 when an involuntary Chapter 7 petition was filed against FSE by several of its creditors. FSE consented to the entry of an order for relief on the condition that the case be converted to a Chapter 11 reorganization, and the court so ordered on July 17, 2017. The Sureties removed the state court case to federal court on June 29, 2017, and the district court referred the case to this court by order dated August 3, 2017. FSE filed a motion for leave to amend its complaint on December 27, 2017; the motion was denied by order dated January 5, 2018.

FSE had been in the business of designing, manufacturing and installing large pieces of industrial equipment for various clients around the world. Beginning in the fall of 2012, the Sureties issued bonds for those projects pursuant to an Agreement of Indemnity that was executed on September 13, 2012.[1] At the time of the trial, the Sureties were holding collateral in the amount of $3,409,650, and the Sureties potentially owed payment to clients of FSE under bonds issued on behalf of FSE in the amount of $11,322,495.

FSE argues that $1.6 million of the collateral held by the Sureties was put up as security

[1] Trial Exhibit 3. This is the original and only agreement between FSE and the Sureties. A later version of this original agreement was proposed by the Sureties but never executed by FSE.

for a bond on a project in Mayo County, Ireland (the "Mayo Bond"), and that the Mayo Bond was released after the Mayo project was terminated. Additionally, it argues that $750,000 was put up as security for the Hugoton project, which was also completed. As such, FSE argues it is entitled to repayment of $2.35 million in cash that it put up when the bonds were issued. The Sureties argue that the funds they are holding are cross-collateralized across multiple bonds issued in other projects FSE worked on, not just the Mayo Bond or the Hugoton Bond, and as such, they are entitled to use those funds to offset their losses on any bond they issued for the benefit of FSE. The parties agree that the choice of law provision in the Agreement of Indemnity provides that New York State law shall apply.

## II. Legal Analysis

### A. Burden of persuasion

The court begins by determining who has the burden of persuasion in this matter. Because FSE is seeking the return of funds that it paid to the Sureties pursuant to the Agreement of Indemnity, and FSE now contends the Sureties are holding the funds in breach of the contract between them, the court finds that FSE as plaintiff bears the burden of persuasion in this matter.[2]

### B. The contract is not ambiguous

The court next examines the language in the Agreement of Indemnity between the Sureties and FSE dated September 13, 2012. The relevant provisions state:

> NOW THEREFORE, in consideration of the SURETY executing the Bonds, the INDEMNITORS agree that:
>
> 1. PREMIUMS & COLLATERAL FOR SURETYSHIP- The

---

[2] *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 126 S.Ct. 528, 163 L.Ed.2d 387 (2005) (plaintiffs bear the burden of persuasion regarding the essential aspects of their claims).

> INDEMNITORS shall pay or cause to be paid to the SURETY both the agreed premium and, upon written request by the SURETY at any time, collateral security for its suretyship until the INDEMNITOR shall furnish to the SURETY competent written evidence, satisfactory to the SURETY, of the termination of any past, present and future liability under **any** Bond. The INDEMNITOR expressly waives any right to interest which may be earned on the collateral security and further consents that the collateral security provided in consideration of suretyship may be held by the SURETY in any investment or depository that the SURETY in its sole discretion deems advisable and prudent. The Surety's election not to demand collateral at the inception of the suretyship obligation shall not operate as a waiver of the right to demand and receive such collateral at any time before liability has terminated under **any** Bond. (Emphasis added)
>
> 2. INDEMNITY & COLLATERAL FOR CLAIM - The INDEMNITOR shall indemnify and save harmless the SURETY from and against any and all liability, claim, demand, loss, damages, expense, cost, attorney's fees and expenses, including without limitation, fees and disbursements of counsel incurred by the SURETY in any action or proceeding between the INDEMNITOR and the SURETY, or between the SURETY and any third party, which SURETY shall at any time incur by reason of its execution of any Bond or its payment of or its liability to pay and claim, irrespective of whether the claim is made against the SURETY as a joint or several obligor and whether the INDEMNITOR is then liable to make such payment, and to place the SURETY in funds to meet all of its liability under any BOND, promptly upon request and before the SURETY may be required to make any payment thereunder; and copy of the claim, demand, voucher or other evidence of the payment by the SURETY of any liability, claim, demand, loss, damage, expense, cost, and attorney's fees, shall be prima facie evidence of the fact and amount of INDEMNITOR'S liability to the SURETY under this Agreement. Any demand upon the SURETY by the Obligee shall be sufficient to conclude that a liability exists and the INDEMNITOR shall then place the SURETY with sufficient funds in a form and amount deemed acceptable in the SURETY'S sole discretion, as collateral security to cover the liability.

The parties both agree that the court need only look to the four corners of the agreement to determine the plain meaning of the agreement. But, both FSE and the Sureties each argue that the plain meaning of the agreement supports its own reading.

The court finds that the word "any", emphasized above, supports the Sureties' reading of

the agreement. The agreement does not say that collateral security for the suretyship lasts until the indemnitor furnishes written evidence of the termination of past, present and future liability under **the** Bond, it says until the termination of past, present and future liability under **any** Bond. This is consistent with the purpose of the agreement, which is to protect the Sureties from incurring loss in the issuance of bonds. This is also consistent with industry practice.[3]

FSE argues that because the contract reads "any Bond" rather than "any Bonds" or "any and all Bonds," it is not clear that the term "any Bond" is plural and not singular. The court disagrees. The contract states that FSE shall pay collateral security to the Sureties until there is no further liability on any bond, and that includes all bonds the Sureties have executed on behalf of the FSE. This interpretation makes sense and is consistent within the four corners of the agreement, and the court need look no further.

**C. The extrinsic evidence also favors the Sureties' argument**

Although the court does not find the agreement ambiguous, the court will discuss some of the other arguments raised by the parties. Generally, an ambiguous agreement would be construed against the party that drafted it, here the Sureties. But where a contract is ambiguous, a court also may look to extrinsic evidence to determine the parties' intent. Here, if the court were to look outside the four corners of the Agreement of Indemnity for its answer and examine the exhibits introduced at trial and the testimony of the witnesses the weight of the extrinsic evidence would favor the Sureties.

---

[3] Testimony of Chris Vahey. Transcripts were not ordered of this trial, so the court cannot reference an exact page number for Vahey's testimony on this point, but he did testify as to industry practice based on his 20 years of experience. His testimony was consistent with the court's understanding of the practices of sureties in general.

**1. Marsh and O'Keefe were not the agent of either party**

First, the court will address the arguments as to whether Marsh, USA ("Marsh") the entity that acted as a broker for the transactions between the Sureties and FSE, was the agent of either party. The Sureties argue that Marsh was an agent of FSE because they wish to attribute knowledge the broker had to FSE. FSE argues that Marsh was the Sureties agent because it does not want the court to attribute the broker's knowledge to FSE. The court finds that neither O'Keefe nor Marsh was an agent of either party, but rather that Marsh, through O'Keefe and its other employees, acted as an intermediary between FSE and the Sureties. Marsh would put the deal together and by doing so earned a commission that was paid by the Sureties.

The Sureties cite several cases involving New York Insurance law that stand for the proposition that an insurance broker that procures policies for an insured is generally considered to be an agent of the insured.[4] None of the cases cited by the Sureties involve a surety bond; rather, the cases all involve property or casualty insurance. Although it is true that under New York insurance law, surety bonds are considered a "kind of insurance," it is also true that "the usual view, grounded in commercial practice, [is] that suretyship is not insurance." *In re Frontier Ins. Co.,* 945 N.Y.S.2d 866, 871 (N.Y. 2012), *citing Pearlman v. Reliance Ins. Co.,* 371 U.S. 132 n. 19, 83 S.Ct. 232, 9 L.Ed.2d 190 (1962). Simply stating the proposition that under New York insurance law the broker is the agent of the insured is not enough. In *Lumbermens Mut. Cas. Ins. Co. v. Franey Muha Alliant Ins. Services,* 388 F.Supp.2d (S.D.N.Y. 2005) the court stated that the question of whether an agency relationship exists is a mixed question of law

---

[4] *Ribacoff v. Chubb Group of Ins. Companies*, 2 A.D.3d 153 (N.Y.2003); *2540 Assocs., Inc., v. Assicurazioni Generali, S.p.A.,*271 A.D.2d 292 (N.Y. 2000); *Passarello v. Lexington Ins. Co.,* 740 F.Supp. 933 (D.Conn.1990).

and fact.[5] "Agency requires a showing of 1) the manifestation of the principal that the agent shall act for him, 2) the agent's acceptance of the undertaking, and 3) the parties' understanding that the principal is to be in control of the undertaking."[6]

Most of the transactions and communications between Marsh and the parties took place through a Marsh employee, John O'Keefe. Much of the evidence introduced at trial consists of emails between O'Keefe and representatives of FSE on the one hand, and O'Keefe and representatives of the Sureties on the other. Nothing in the emails indicate that O'Keefe was doing anything but acting as an intermediary between the parties so that FSE could obtain surety bonds for its projects through the Sureties. It appears that the Sureties and FSE did not ever directly communicate with each other until just before this litigation commenced; rather they communicated exclusively through O'Keefe or other Marsh employees. There is nothing in the emails, however, to indicate that Marsh, or O'Keefe was the acknowledged agent of one party or the other. Additionally, the testimony of the various principals of FSE and the Sureties show that neither party thought Marsh was its own agent. The court finds that any knowledge imparted to O'Keefe or understanding gathered by him from one party cannot be attributed to the other party unless it was expressly put in writing, such as in the emails entered into evidence.

**2. FSE was aware that the Sureties pooled the collateral.**

FSE argues in its post-trial brief that the Sureties never told FSE that the bonds were cross-collateralized. It further argues that it wasn't aware that the Sureties' position was that the collateral was security for more than one bond until after the conflict over the Mayo Bond

---

[5] *Lumbermens* at 301.

[6] *Id* at 301-02, *citing Manley v. Ambase Corp.,* 337 F.3d 237, 246 (2nd. Cir. 2003).

collateral arose. It states in its brief that the first time cross-collateralization was ever raised was in the March 24, 2016 email from O'Keefe to McCulloch. This is simply not the case. There is an email sent by O'Keefe to Elizabeth "Betsy" LaBorde, an FSE employee (and the sister of FSE's CEO) with copies to Erin Eckert, FSE's counsel at the time, and James LaBorde (another FSE employee) dated August 29, 2013. The email states : "Attached is the LC format for ACE. I am not sure if I sent this to you yesterday or not. We will need this sent to Ace in the amount of $750,000 in support of the bonding program. While this need arose from the request for the Abengoa bond, it should be noted that Ace will hold LC's (as most sureties do) on an account basis...."[7] Thus, if it was not aware earlier, FSE was on notice less than a year after the parties executed the Agreement of Indemnity that the Sureties considered the collateral on an account basis rather than only for each separate bond. LaBorde testified that she did not understand this, which she may not have, but surely FSE's corporate counsel, Ms. Eckert, who earlier in this same email chain was negotiating the bond terms with the Sureties, would have understood what this meant. Additionally, on December 12, 2014 O'Keefe sent an email to Will McCulloch, the Controller for FSE, stating: "Please see the confirming email below. Like all surety companies, Ace holds collateral on a "pooled" basis for all contracts."[8] Thus, at least twice before conflict arose between the parties, FSE was told that collateral was being held on an account or pooled basis.

Then in 2016, the emails FSE reference in its brief are sent. Beginning on March 21, 2016, McCulloch emailed O'Keefe asking for confirmation of the amounts the Sureties were

---

[7] Trial Exhibit 15.

[8] Trial Exhibit 44.

holding as bond collateral.[9] After O'Keefe replied, McCulloch asked for a breakdown of amounts on a per bond basis. Another employee of Marsh, Joanne Czlapinski, replied, "The collateral is held on an account level not at a bond level so I can't break the collateral down by bond."[10] O'Keefe also separately replied that: "Sureties do not hold collateral on an individual bond basis, but rather in a pooled fashion. This is noted in both the indemnity agreement and the collateral security agreement."[11] The court does not accept FSE's argument that 2016 was the first it had heard of the cross-collateralization of the funds it had put up for the various bonds over time.

It is true, that the parties seemed to be engaged in a sort of hybrid arrangement at times. There were definitely projects that the Sureties requested specific collateral for, and at times the Sureties released collateral when a project was completed, but it does not follow that the Agreement of Indemnity did not contemplate cross-collateralization.

For example, FSE argues that the originally proposed collateral structure which provided for pooled collateral was never put in place. Initially the terms for the collateral were to be as follows: "Collateral provided in $5.0mm increments. Each $5.0mm in collateral will warrant $15.mm in capacity, with initial capacity of up to $60.0mm."[12] The Sureties later agreed to reduce the amounts to "$7.5mm in capacity for $2.5mm in collateral to start the program off."[13]

---

[9] Trial Exhibit 85.

[10] *Id.*

[11] Trial Exhibit 86.

[12] Trial exhibit 1. Email from James Gorman, an employee of the Sureties to O'Keefe dated August 21, 2012.

[13] Trial Exhibit 5. Email from James Gorman to O'Keefe dated February 1, 2013.

Eventually, for the first bond issued by the Sureties on behalf of FSE, the arrangement was a $5 million bond for $750,000 in collateral. The emails show that this arrangement, which does indeed seem like a per bond basis deal was made because the project itself was unusual.[14] This does not mean, however, that because a switch was made for this particular project, somehow the Sureties rights to hold collateral on an account basis was foreclosed.

**3. The second, unexecuted indemnity agreement**

FSE also makes an interesting argument concerning an unexecuted Agreement of Indemnity that FSE was asked to sign some time after the relationship between FSE and the Sureties had begun. Although the second (unexecuted) agreement the beginning part of the paragraph entitled PREMIUMS & COLLATERAL FOR SURETYSHIP is identical to the language quoted *supra* pages 3-4 from the original agreement, it contains the following additional language:

> Any and all collateral security now or in the future held by, or under the control of the SURETY shall secure all obligations of the INDEMNITOR to the SURETY arising, at any time, under the BONDS and the Agreement. The SURETY shall have first priority security interests in and liens on any and all such collateral security and such collateral security shall not be subjected to any security interest or lien of any other person or entity and no further actions shall be required of the SURETY or any other party in order to establish or perfect such security interests and liens.[15]

FSE's argument is that if the executed Agreement of Indemnity really provided for cross-collateralization of the security for the bonds, the Sureties would not have needed to ask FSE to execute this second Agreement with language that more specifically addresses this point.

---

[14] Trial Exhibits 12 and 13.

[15] Trial Exhibit 67.

At first blush this argument is quite appealing. Upon examination of the two agreement and the emails among the parties, however, it becomes apparent that the Sureties argument that the reasons for asking FSE to execute the second agreement was not motivated by a concern that the collateral was only held on a bond specific basis. Rather, the Sureties argue that the updated agreement was requested so that there would be an agreement that contained performance - contract specific language (i.e., performance bonds, rather than the supply and payment bonds that the Sureties had also been writing for FSE). This is supported by the evidence.

On July 16, 2014 Chris Vahey ("Vahey") a representative of the Sureties emailed O'Keefe about FSE. In that lengthy email, he stated: "**ACE GIA:** Needs updating to include contract specific language. We will want to have this completed via new GIA or addendum. (Forgot to mention in our call - I will follow up)."[16] Later in this same email, when discussing the Sureties willingness to issue additional bonds, he states: "In that regard, ACE is currently willing based upon updating the GIA to add contract rights and gaining the project specific information, to potentially consider the two Canada based projects without collateral, but we feel at this time we will only consider Mayo at a roughly $8MM bond penalty based on a 50% or $4MM ILOC from an ACE approve bank or cash."[17] This is the first time the second agreement is mentioned in any document in the evidentiary record of this matter.

Then on August 8, 2014, Joseph A. Gaskill, Jr., an employee of the Sureties writes to O'Keefe: "John, the captioned Advanced Payment, P&P, and Warranty bonds are approved for FSE's Ibidrola Merritt contract. I've attached a revised indemnity agreement that includes

---

[16] Trial Exhibit 31 at p. 3.

[17] *Id.*

contract provisions. As discussed, our approval for this bond is based on our understanding that FSE will execute this new agreement as soon as possible."[18] On August 11, 2014 O'Keefe sent an email to James "Bo" Thibaut, II, the CEO of FSE. It stated, "Bonds are approved within the collateral held by ACE. We will get these out tomorrow. The only condition is that ACE would like to put a more traditional indemnity agreement in place for construction obligations. The form is still a relatively tame obligation in relation to most surety construction indemnities, but I would certainly have counsel review the document."[19]

On August 17, 2015 O'Keefe sent an email to Thibaut: "Ace is looking to update its indemnity agreement with FSE. The old form did not really contemplate a contract claim situation and this version will cover that possibility. They are requiring this form from all of their contract clients."[20]

All contemporaneous references to the second, unexecuted indemnity agreement reference that the new agreement is requested because of the types of performance bonds FSE was requesting, not because of cross-collateralization. This interpretation is also supported by placing the two agreements side by side. Besides the additional language in the Premiums & Collateral for Suretyship paragraph, the second agreement adds eleven other sections that did not exist in the executed Agreement of Indemnity, and the additional sections are consistent with the Sureties stated reasons for requesting an additional agreement be signed by FSE.[21] Although

---

[18] Trial Exhibit 32.

[19] Trial Exhibit 36.

[20] Trial Exhibit 66.

[21] The additional paragraphs are entitled: Event of Default, Settlement, Books and Records, Change in Control, Perfection of Security Interest, Assignment, Trust, Takeover of

FSE is correct that the second, unexecuted agreement added specific cross-collateralization language, nothing in the record suggests that the Sureties asked FSE to sign the second agreement because it was worried about its ability to keep the collateral on an account basis.

The court notes a second problem with the argument that the executed Agreement of Indemnity did not contemplate cross-collateralization. The Agreement of Indemnity was signed on September 13, 2012, which, as FSE argues in a different section of its brief, was during the time the parties were contemplating a pooled arrangement as evidenced by the emails from James Gorman (an employee of the Sureties) to O'Keefe on August 21, 2012 and February 1, 2013. If the parties were negotiating a pooling arrangement, it would be highly unusual that the agreement the Sureties gave FSE to sign would be one that did not provide for cross-collateralization.[22]

**4. Both parties agreed to use the collateral as settlement funds**

Another factor the court would consider in evaluating the extrinsic evidence is that FSE asked the Sureties to retain $1.6 million of collateral from the Mayo Bond and an additional $500,000 in other collateral that was held by the Sureties to use as settlement for the Iberdrola project. Vahey testified at trial that FSE had asked to use the collateral the Sureties were holding to fund a settlement with Iberdrola. This is supported by an email from Vahey to O'Keefe dated May 25, 2016:

---

Performance, Attorney-in-Fact, Currency, and Counterparts.

[22] FSE also makes a related argument under the doctrine of *expressio unius est exclusio alterius* ("the expression of one thing means the exclusion of other things") that because the second, unexecuted agreement contained language that was not in the first, executed agreement, the omission was intentional. The court examined the cases cited by FSE, and found them to be inapposite.

> John, per our discussion yesterday, we would look favorably on a renegotiation/settlement whereby Factory Sales successfully gets Chubb Surety released in writing for all past, present and future liability associated with the Iberdrola Merrit project and our $3.9MM performance and payment bond as well as the $1.974M warranty bond. You noted that Factory Sales would require Chubb to either release a portion of the existing account collateral or pay it directly to Iberdrola as part of the release. The figure is roughly $2.1MM.
>
> We would obviously wish to see a draft of the release prior to execution as well as the contract amendments/closure documentation prior to committing to this process but on the front end it does sound like a structure we could work with.

Another email chain that discusses this is between Betsy LaBorde and O'Keefe.[23] In the first email O'Keefe discusses what the Sureties would be willing to do to settle the Iberdrola project. LaBorde reples: "I am not sure I fully follow if anything below discusses the amount of collateral required to maintain on Enesa for the supply bond once all of the Iberdrola bonds are released. Based on the status of that and how far along we are, we are really hoping to work together to release more of the collateral outside of the Iberdrola release once that is completed." O'Keefe replies that the Sureties will want to retain some collateral and he agrees it will be less than the $1.8 million remaining after the settlement. He also advises that FSE needs to wait until the Iberdrola settlement is finalized before asking for the return of any more collateral.

Also, as the Sureties raise in their pre-trial brief, throughout the time that the Sureties were writing bonds for FSE, FSE did not post separate collateral for the LaGloria Bond, the CertainTeed Bond or the Enesa Bond. FSE does not dispute this, but rather suggests that the Sureties had little exposure on these bonds, so it made the decision not require collateral for them. FSE states that the LaGloria bond, which was a $270,000 supply bond was the first bond the Sureties issued, and they did not require any collateral to be posted for that bond. FSE

[23] Trial Exhibit 102.

suggests that the same is true for the other two bonds. The Enesa bond was a $7,633,337 supply bond. The court finds it improbable that a surety would issue a bond of this size with no collateral required. Thus, at a minimum, the issuance of the Enesa bond suggests that the Sureties were relying on other collateral they held in the FSE account as collateral for the Enesa bond.

## III. <u>Conclusion</u>

The court finds it highly significant that the Sureties and FSE seldom, if ever, communicated directly with each other. Thus, each party could continue in its own interpretation of the Agreement of Indemnity and each interpretation made sense from that party's standpoint. The court finds, however, that the contract is not ambiguous, and the Sureties' interpretation of the contract is the correct one.

Additionally, even if the contract were ambiguous, the extrinsic evidence would still favor the Sureties. FSE's arguments that it had no knowledge that the Sureties held the collateral on an account basis rather than on a bond by bond basis is contradicted by the emails showing FSE did have knowledge prior to 2016. Additionally, FSE asked the Sureties to use collateral from one project to fund potential settlements on two other projects. The Sureties also issued bonds for which no collateral was put up by FSE, which further supports the account as a whole theory. Finally, the best argument FSE had, which was that the Sureties requested that it sign the second Agreement of Indemnity because the executed Agreement of Indemnity did not provide for cross-collateralization just doesn't stand up. The argument is undercut both by the language in the executed agreement itself, which although not as explicit as the unexecuted agreement, can reasonably be read to allow cross-collateralization, and by the evidence showing

that the reason the Sureties requested FSE sign the second agreement was not for the purpose of providing specific cross-collateralization language.

Taken as a whole, if the court were to evaluate the extrinsic evidence surrounding the Agreement of Indemnity, the court would conclude that FSE has failed to carry its burden of persuading the court that the contract does not allow for cross-collateralization. As already stated, however, the court finds, based on the contract language alone, that the Sureties are entitled to keep the $2.35 million in collateral that is the subject of this suit and apply it to any outstanding claims on projects that were not completed by FSE.

A separate order will be entered in conjunction with this opinion.

New Orleans, Louisiana, June 14, 2018.

J. A. Brown

Jerry A. Brown
U.S. Bankruptcy Judge